**William Clem RIGGS, Jr., Employee-Claimant-Appellant,**

v.

**A. P. GREEN FIRE BRICK COMPANY, a Corporation, Employer-Defendant-Respondent.**

No. 31520.

St. Louis Court of Appeals.

Missouri.

March 17, 1964.

Edwards, Wright & Seigfreid, Jerome Seigfreid, Mexico, for employee-claimant-appellant.

Barnes & Barnes, Latney Barnes, Mexico, for employer-defendant-respondent.

BRADY, Commissioner.

■ This is an action for workmen's compensation. The employee alleged that he suffered from a permanent and total disability due to contacting the occupational disease "silicosis." The referee ruled that the employee was entitled to compensation. Upon review the Industrial Commission, hereinafter referred to as the commission, reversed this award and entered its order denying compensation. The circuit court found that there was sufficient competent evidence in the record to substantiate the decision of the commission and affirmed that decision. The amount claimed by the employee is $40.00 per week for 300 weeks, being a total sum of $12,000.00. After the expiration of that period, he also claims the sum of $27.50 per week for the remainder of his life. This court has jurisdiction, Scannell v. Fulton Iron Works Co., 365 Mo. 889, 289 S.W.2d 122.

The claimant was 44 years of age at the time of the hearing. He began his employment with the A. P. Green Fire Brick Company, hereinafter referred to as the company, on September 18, 1941 and went to work in the finish grinding department where all kinds of brick were ground to various sizes and shapes. There were not sufficient dust collectors to remove the dust from the finish grinding room. Respirators were furnished the employees by the company, but it was not always possible to get sufficient air through the respirators, and moreover they would become clogged with dust and would also freeze in the winter time. Even when working at their best, the respirators did not completely eliminate the dust which permeated the clothing of the employees and entered the nose and throat of the workmen. In March of 1945 the employee went into military service. He returned to the company in April of 1946 and continued to work in the finish grinding department until September of 1951. In September of that year he became a shed captain and never thereafter wore a respirator except for two weeks when he was sanding some trucks. His work was then in the north shed which was located some sixty feet north of the finish grinding department, and it was his estimate that 40% to 50% of the dust from the grinding department went into the north shed. In 1959 the employee was transferred to the kiln department where the dust was much lighter, but in July of that year appellant returned to the north shed as shed captain and remained there until his employment was terminated due to reasons of health on May 11, 1960.

■■ Our duty upon appeal of a case of this nature is well settled. In Thacker v. Massman Construction Co., Mo., 247 S.W. 2d 623, 1. c. 623, 627, the Missouri Supreme Court en Banc has said: "As the reviewing court, we may not substitute our own judgment on the evidence for that of the Industrial Commission, but we are authorized 'to decide whether such tribunal could have reasonably made its findings, and reached

its result, upon consideration of all the evidence before it; and to set aside decisions clearly contrary to the overwhelming weight of the evidence.' (citing cases). In determining these issues we first view the record in a light most favorable to the findings of the Commission, consider the favorable inferences which the Commission had a right to draw from the evidence before it, and then determine whether the Commission's findings, even if supported by competent and substantial evidence, are contrary to the overwhelming weight of evidence in the whole record." See also Fisher v. Hennessey, Mo.App., 329 S.W.2d 225; Missouri Digest, Workmen's Compensation, § 1939. We will state the evidence with these rules in mind. We have included portions of testimony given by the employee's medical experts because we think that when their testimony is read in the context of the whole record, even the testimony of the employee's experts supports the commission's action in denying compensation.

It was admitted that the company was operating under the provisions of the workmen's compensation law of this state, that the employee was in the company's employment on or about July of 1960 and that the company had notice of the inception of the occupational disease. It was further admitted that a claim for compensation was timely filed, that the maximum compensation rate of $40.00 a week would apply, and that no compensation or medical expense had been paid by the company. The employee and employer stipulated that at the times pertinent to this case there was free silica in the air at the company's plant.

During the term of his employment the employee did not suffer from pneumonia. Neither did he contact any kind of virus disease of the lungs, nose or throat, nor did he suffer from a severe cold during this period. The first time he noticed any difficulty in breathing was in October of 1958. However, the employee testified that he had been hospitalized in October of 1957 for "Shortness of breath and pain in the chest." He

also admitted that he was again hospitalized in 1958 for the same reason and went to the hospital three times in 1959 for the same thing. He was hospitalized once in 1960 for this ailment and twice for other causes. The employee further testified that on this occasion in October of 1958 he experienced shortness of breath and pain across his chest; that he consulted a physician who put him into the hospital and kept him there for four days; upon being released he went to Hannibal and entered a hospital under another physician's directions; that when he returned to work he went to his foreman and filled out a notice of employment termination giving as a reason that he had suffered from a heart attack; that Dr. Kallenbach, who had hospitalized him on June 6, 1959 for shortness of breath and pain in the chest, had told him he had a "Coronary insufficiency"; that on another occasion he was told that he had a coronary thrombosis; that the pain in his chest came upon him suddenly; and that he had never suspected his trouble was in any way connected with the breathing of dust or his working conditions until July of 1960 while he was being treated by Doctors Smith and Grayson.

In July of 1960 the employee consulted Dr. Smith, a thoracic surgeon. The doctor administered some tests and as a result of his examination concluded that there were no defects in the employee's heart. He did find that the employee was slightly obese and became dizzy on slight exertion. He testified it is infrequently that obesity accompanies silicosis when that disease has reached its latter stages. When the employee first came to see Dr. Smith, the employee told him that he had had pains in his chest and that these had been relieved by nitroglycerin tablets. He identified the tablets as the kind most generally and frequently used to correct heart trouble. He took X-rays which he stated showed " * * * a very minimal bilateral pulmonary infiltrate with coarse bronchial markings at the right base * * *" which were not extensive in nature. He was asked to compare X-rays taken in 1946 with the X-rays he took in

1960 and answered that he did not feel that there was much change and that the bronchial markings to which he referred were obvious in both films. Dr. Smith stated that he observed no silicotic nodules in the X-ray films and stated that generally a man is not considered to have silicosis until it shows up in the X-ray. However, he did not agree with that general rule.

Due to his clinical findings, Dr. Smith did a lung biopsy on the employee and submitted the tissue to Dr. Johnson for a pathological report. This witness testified that there were probably more than 3,000 kinds of pneumoconiosis, and his conclusion that the employee's pneumoconiosis had any connection with silica was made on the basis of the employee's history, the finding of the silicon particles by the pathologist and upon mass spectrology or spectrophotometry. However, upon cross-examination he testified that his diagnosis that the employee's conditon was due to silicosis was "* * * entirely * * *" based on the findings of Dr. Johnson that there were silicon particles in the employee's lung. He further stated that if persons equally competent to Dr. Johnson determined that there were no silicon particles in the employee's lung, he would not have diagnosed silicosis in the absence of the findings by actual analysis that the employee had an increased amount of silicon in his lungs. Dr. Smith testified that as a result of his clinical analysis and the X-rays and other information that he was able to obtain, it was his opinion that the employee suffered from pneumoconiosis secondary to silicosis. He rated the employee as 100% disabled.

Dr. Johnson examined the biopsy specimen of the employee and found the lung tissue to be abnormal. It showed evidence of scar formation, and he found associated with the scars fragments of refractile material which were crystalline in nature. He found some hypertrophy of the blood vessels consistent with pulmonary hypertension.

Dr. Johnson found the specimen he examined to demonstrate fibrosis and that the scar tissue formations were accentuated in focal areas. His testimony was that while one could call this nodulation, "* * * it is not the lesion as conventionally used in silicosis. The nodulation of silicosis is a larger process that is visible grossly. It doesn't require a microscope. They are not microscopic nodules, they are large gross nodules." He felt this absence of nodules could be explained by the fact that the tissue specimen he examined was taken from the periphery of the lung rather than the central zone, and the disease of pneumoconiosis is usually most marked in the central zone and diminishes as you approach the periphery. The doctor also testified that the very absence of the characteristic silicotic nodules rendered his diagnosis of silicosis less certain.

With respect to the refractile material he found, Dr. Johnson stated that the exact nature of the crystalline substance could not be determined by a microscopic examination, but that they were compatible with quartz which is a common substance that can cause the disease known as silicosis. However, he also testified that while it was compatible with quartz, it was compatible with many other things and that a great number of agents living and nonliving other than silica could cause the condition he found in his examination of the specimen. Dr. Johnson testified these crystalline substances might be metallic or carbonaceous and that it was only because of the history which the employee gave him that they were identified as silicious. This witness admitted that he did not examine the refractile crystalline particles observed by him under polarized light, although he recognized this as an accepted procedure. When asked if he agreed with a statement by one of respondent's doctors to the effect that these particles were not silicious, he stated, "* * * My interpretation was that they could be."

Dr. Johnson stated his conclusion in this manner, "* * * I interpreted the dis-

ease as being a pneumoconiosis of the lung. There was a history of an exposure to silica dust and findings are consistent with the diagnosis of silicosis." He admitted that although his diagnosis of pneumoconiosis was certain, he had to rely upon the history of exposure to silica dust to arrive at a diagnosis of silicosis. He was asked this question and made this answer: "Q When you made your diagnosis you diagnosed it as pneumoconiosis and then simply said that it was best explained by history as being silicosis? A Yes, sir." At the conclusion of his testimony the referee asked for his conclusion as to the tissue specimen and its condition without reference to any history given to him by the employee. He stated that his " * * * diagnosis was pneumoconiosis due to an unidentified foreign material."

Dr. Ben Jolly, the employee's treating physician, first saw him in February of 1960 when the employee gave a history of a heart attack and hospitalization for that ailment. The doctor next saw the employee when he was complaining of a pain in his abdomen which the doctor diagnosed as a spastic colon. In April of 1960 when Dr. Jolly again had the employee admitted to the hospital, his diagnosis was that the employee was suffering from emphysema and bronchitis, and the doctor stated that the employee made no complaints about his lungs. Dr. Jolly gave his opinion that the employee was suffering from pulmonary fibrosis due to silicosis and was 100% disabled. He gave as a basis for that diagnosis the employee's history, his physical findings and pathological report.

A part of the lung biopsy specimen was also submitted to a Dr. Pickett, a professor of agricultural chemistry and supervisor of the spectrographic laboratory of the University of Missouri. Dr. Pickett explained the working of a spectrograph and stated that the qualitative result of a spectrographic analysis is greater than the quantitative result. For the purpose of his examination Dr. Pickett was furnished with two pieces of tissue, one being the specimen from the employee's lung and the other being a specimen of unknown origin from a lung and referred to as the control sample. His testimony was that spectrographic analysis determined that the employee's specimen had from two to ten times as much as the amount of silicon found in the control sample. It also contained from ten to one hundred times more tin, and slightly more iron than the control sample. He found both the employee's specimen and the control sample to contain evidence of silicates, but he could not state on the basis of his examination whether the employee's sample had more or less than a normal amount of silicon. It was also impossible for him to tell whether the silicon in either the employee's specimen or the control sample was metallic or nonmetallic. Neither could he tell the chemical forms of the tin, iron or silicon which he found in the specimen. His further testimony was that there were thousands of kinds of silicates and that spectrographic analysis could not determine the amount of free silica.

On behalf of the respondent Dr. Waggoner testified that he examined the X-rays taken in 1946, 1947, 1949 and 1960 and that he could see no evidence of active or progressive pathology. He also noted basilar markings that the other medical men had commented on and stated that while they were prominent, he saw nothing that looked like a bronchial infiltrate. He attributed the exaggerated markings around the bronchial tree to what he characterized as the usual Missouri sinus trouble. This witness did not find any fibrosis to be shown in the X-rays. Dr. Waggoner's examination and testimony was limited entirely to the X-rays.

A part of the lung specimen was forwarded for examination to Dr. Schepers, a pathologist who specializes in the study of dust diseases and tuberculosis. Dr. Schepers testified that he was the author of numerous papers on pneumoconiosis and silicosis; that his examination of the slides and a tissue block revealed a thickening of the pleura which contained abundant blood

vessels; and that this was significant, because the abundance of blood vessels in the pleura reduced the possibility that the thickening could have been caused by silicosis. His opinion in this regard was also bolstered by the fact that he found the lymphatic channels in the pleura to be prominent, which also suggested to him that the thickening of the pleura was not caused by silicosis. Dr. Schepers found the alveolar spaces beneath the pleura to be distended with a breakdown of their intervening walls and testified that this is a condition of emphysema. He also testified that in the alveolar walls there were abundant blood capillaries over their surfaces and coursing down through their structure. He stated that this was significant, because in the majority of pneumoconiosis cases caused by silica dust these capillaries tend to be closed rather than be prominent. His findings with regard to the respiratory passages, the bronchi, the bronchioles and the alveolar ducts also were given significance in his testimony. He found these air passages to be deprived of their epithelial surfaces and mucosal layers, and his conclusion was that this was a condition of bronchitis or bronchiolitis.

With regard to the particles which had been found by Dr. Johnson, it was Dr. Schepers' opinion that they were not of silica origin. He testified that he examined them under polarized light and found they were not visible under such light. He stated that when particles were visible under polarized light, they were referred to as being birefringent and that in the diagnosis of silicosis he would expect to find birefringent material, because silica in the form of quartz is birefringent. His further testimony in this regard was that microscopic examination of these particles did not lead to their definite identity, but that he found none of the acceptable criteria of silicosis present. He further stated that these particles were probably only present as a coincidence and were possibly inert material. Dr. Schepers found these particles not to be excessive as compared to normal lung tissue, and stated, " * * * I have seen more opaque material in city dwellers who breathed the dust from the city air." He concluded that the opaque particles observed by him in the specimen were either carbonaceous or metallic and not quartz or silica.

Dr. Schepers' further findings as to the significance of the opaque particles were related to his finding that the particles were more numerous in the areas where there was the least fibrosis and that in those areas where there was the most fibrosis the particles were almost absent. Based upon this finding, his testimony was that the fibrosis had nothing to do with the presence of these particles and that if the employee had silicosis, he would have expected to find a high concentration of silica in the fibrosis. In this regard he testified, " * * * The very fact that these particles were absent or found occasionally in the scar tissue is of great diagnostic importance. And this finding and this finding alone can rule out silicosis."

Dr. Schepers also placed emphasis upon the absence of any silicotic nodules, testifying that it is the consensus of opinion among medical men that the presence of silicotic nodules must be demonstrated by X-ray or by sectioning before a diagnosis of silicosis can be made. His further testimony was that while making a diagnosis it is helpful to have an occupational and clinical history, photographic evidence and physical examination. However, it was possible to come to a conclusive diagnosis of a condition such as silicosis even in the absence of these elements. He did testify that silicosis starts without nodules, because it starts the day a silica particle enters the lung and kills a cell. However, he went on to state that silicosis does not become recognizable medically until much later. He testified that this employee's history of a coronary and hospitalization would be compatible with emphysema and fibrosis around the blood vessels.

The employee's X-ray films were submitted by the company to a Dr. Hannon. The films studied covered the period 1946 to 1960 or 1961. Dr. Hannon was asked to define silicosis and gave the definition of that disease as follows: "Silicosis is a condition of the lungs caused by the prolonged inhalation of silicon dioxide and is characterized by diffuse fibrotic lesions throughout both lung fields which can be demonstrated by suitable X-ray films and in pathological specimens. Silicosis occurs in various stages of severity, and in the severer forms it can cause coughs, shortness of breath, tightness in the chest and a lessened capacity for work." Dr. Hannon testified that if free silica is retained in the lungs, it causes fibrosis; that he found the films he examined to show a condition within normal limitation except for an increase in the basilar bronchial markings and a small area of fibrosis extending out from the level of the second interspace with some calcification along the peribronchial markings. He found no essential or significant changes in the X-rays and stated that he could see no evidence of silicosis in the employee's X-rays. He further testified that he had been instructed to and did observe the employee during the course of the trial, paying particular attention to his respiratory rate, and it was his opinion there was no connection between the employee's respiratory rate and the X-ray films. He admitted that there was some fibrosis present, but he found no evidence of any silicotic nodules. Dr. Hannon further testified that he had studied at least 20,000 chest films of people who either had or were suspected to have silicosis and stated that the silicotic nodules present in a lung show up on an X-ray film in a sort of marbled, polka-dot appearance which some medical people refer to as a snow storm effect. He saw no such evidence in any of the films of the employee.

With reference to the fact that Dr. Johnson had made a spectroscopic examination, it was Dr. Hannon's opinion that such an examination would not be helpful in diagnosis, since the spectroscope could not differentiate between silica, silicon dioxide and silicates but will only show the presence of the element silicon. His testimony was that the presence of the element silicon is not particularly helpful in diagnosis because it is only when silicon is in a free state, known as free silica, that it causes silicosis.

■ While it is the award of the commission that is reviewed, the referee's award and findings are part of the record and should be given due consideration. Patane v. Stix, Baer and Fuller, Mo.App., 326 S.W.2d 402, 1. c. 411. After reciting his findings, the referee's award reads as follows: "The medical testimony produced on behalf of the employee was to the effect that in the opinion of the various testifying physicians the employee is now suffering from an occupational disease, namely silicosis, and that he is 100 per cent disabled and in their opinion will so remain for the remainder of his life. This testimony was based upon physical examinations and laboratory studies. There is in the record no scintilla of evidence as to a physical examination of the employee in behalf of the employer. There is evidence in the record as to laboratory studies of a portion of a biopsy but, according to the record, no physical examination was made in behalf of the employer. It becomes, therefore, very evident that the preponderance of medical evidence is in behalf of the employee, and from that evidence only one conclusion can be drawn, namely, that William Clem Riggs, Jr. is permanently and totally disabled as the result of an occupational disease arising out of and in the course of his employment with A. P. Green Fire Brick Company."

The commission's order, in its parts pertinent to our inquiry, reads as follows: "* * * Claimant alleges that he contracted silicosis. The burden of proving all of the elements of said occupational disease are his. Additionally, he assumes the risk of non-persuasion. Nor may we, in

the guise of liberality, supply material elements of his proof by guess, conjecture or speculation. The usual and ordinary way of proving the existence of this disease is by radiography. The X-rays in this case are negative for silicotic nodulation. Claimant attempts to surmount this obstacle by explaining that his disease has not advanced sufficiently to produce the characteristic nodulation. We find this incredulous in view of the fact that his disease is pathologically advanced to the point that the employee is permanently and totally disabled. Claimant also attempts to demonstrate clinical silicosis by pathological and spectrographic examination of a lung tissue biopsy. His pathologist testified that he observed no silicotic nodules and based his diagnosis of silicosis on the claimant's history. The spectrographic analysis of the lung tissue ash is not, we think, more helpful. Claimant's lung tissue contained two to ten times more of the element silicon than that of the control specimen. It also contained ten to a hundred times more tin and two or three times more iron. We point out that it is not the element silicon which produces silicosis but rather its compounds, most commonly silicon dioxide. While the spectrograph identifies the element, it does not identify the various silicates (Claimant's Exhibit F, p. 19). Claimant's unfortunate condition evinces sympathy but the record considered, we are of the opinion that he has wholly failed to prove that he has silicosis."

■ We are here confronted with a situation where medical experts disagree. The employee would have us hold the opinions stated by the company's experts to be without the necessary facts to support them. The company contends the opinions given by the employee's experts lack the same foundation. We should not enter such a dispute. Medical doctors do disagree. " * * * [W]here the right to compensation depends upon the acceptance of one of two conflicting medical theories, the question to be determined is one of fact to be weighed by the commission, and we are not

to disturb the finding unless the commission acted unreasonably in accepting testimony which was not substantial or in deciding the case against the overwhelming weight of the evidence." Greer v. Missouri State Highway Department, Mo.App., 362 S.W.2d 773 [4]. The opinions voiced by the company's medical experts accompanied by the recitation of reasons which they considered adequate to support those opinions constitute substantial evidence. Greer v. Missouri State Highway Department, supra, at l. c. [7], [8], 362 S.W.2d p. 779 and cases there cited. The weight to be given to the substantial evidence offered by the company's experts as well as that to be given to the substantial evidence offered by the employee's experts is for the triers of the facts, in this case the commission.

■ It is obvious from his findings that the referee agreed with the employee's contention that the opinions stated by the company's experts should be cast aside because they were formulated without the aid of clinical examination. We are not authorized to do so. The evidence was that while clinical examination would be helpful, it was possible to come to a conclusive diagnosis as to the existence of the disease in the absence of such an examination. Dr. Schepers' testimony to this effect was unchallenged and stands uncontradicted. Where the opinion of a medical expert is based upon those means of knowledge which are regarded by that profession as sufficient, we cannot say the opinion is without basis. Schaefer v. Rechter, Mo., 290 S.W. 2d 118, l. c. 124; Greer v. Missouri State Highway Department, supra.

■ It follows that the result reached by the commission was one supported by competent and substantial evidence. Accordingly, the judgment of the circuit court affirming the action of the commission denying the employee compensation is affirmed. The Commissioner so recommends.

RUDDY, P. J., not participating.

PER CURIAM:

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The judgment of the circuit court affirming the action of the commission denying the employee compensation is affirmed.

WOLFE, Acting P. J., ANDERSON, J., and FRANK D. CONNETT, Jr., Special Judge, concur.