Melvin Leroy BARR, Claimant-Appellant,

v.

VICKERS, INC., Defendant-Respondent.

No. 12708.

Missouri Court of Appeals,
Southern District,
Division Two.

Feb. 18, 1983.

Motion for Rehearing Overruled and to Transfer to Supreme Court Denied
March 14, 1983.

---

**579**

*ny,* 618 S.W.2d 725, 726 (Mo.App.1981). The commission is the judge of the credibility of witnesses and a court does not substitute its view of the facts for those found by the commission if the commission's findings are supported by sufficient competent evidence. Id. See also § 287.490.1, RSMo 1969.

In a workmen's compensation proceeding, all doubts should be resolved in favor of the employee and in favor of coverage, *Enyard v. Consolidated Underwriters,* 390 S.W.2d 417, 423, 430 (Mo.App.1965), but that does not extend to validating a claim lacking some essential element. *Welker v. MFA Central Co-Operative,* 380 S.W.2d 481, 487 (Mo.App.1964).

While the claimant does not sustain his burden by showing a possibility that he was exposed to the hazard of silicosis, his burden is satisfied if he shows a reasonable probability that he was exposed and such a probability is a sufficient basis for the commission to find for him. *Smith v. Terminal Transfer Co.,* 372 S.W.2d 659, 664 (Mo.App.1963); *Leonard v. Fisher Body Co. St. Louis Division of General Motors Corp.,* 137 S.W.2d 604, 610 (Mo.App.1940). "Probable" means that it appears to be founded in reason and experience which inclines the mind to believe, but leaves room for doubt. *Welker v. MFA Central Co-Operative,* supra, 380 S.W.2d at 486.

Claimant was employed as a machine operator at defendant's plant in Joplin from June 16, 1969, through May 5, 1975. He apparently has not been employed since then. Defendant is engaged in the manufacture of hydraulic pumps and motors. Claimant's work consisted mainly of drilling and milling upon cast iron pump housings and parts. The parties stipulated that approximately 50% of the housings and housing parts upon which he worked were cast iron parts produced by "sand casting".

Carl Brandt, an expert witness called by claimant, described the process of sand casting. He said that a mold of the part is produced by creating a replica of the part in separate halves from wood, plastic or metal. The replica of one-half of the part is placed in a box and "silica sand" bonded by clay or other material is tightly packed around it. The replica is then removed and the sand allowed to partially dry. This is repeated with the other half and then the molds are combined. Molten metal is then put in the mold to form the part. After the part has cooled it is removed. Silica sand is picked up in the metal during the process. It is generally found in the first one-eighth to one-sixteenth inch of the surface but can exist all through the casting. It can also be present in "sand pockets".

Brandt testified that "the sources of" silicosis from the castings is created "by grinding or several other processes of metal removal" which causes "a likelihood that ... micro-sized particles of silica sand can be placed in the air and thereby inhaled." He stated that claimant's work with the parts would cause "free-floating silica" to be in the air. If a drill bit hit a sand pocket "it is likely that the sand particles would become airborne" and part of them would "become free-floating silica". The amount thrown off would be greater than the average person on the street would encounter in the air.

Claimant testified that many of the housings he worked on had "sand holes" and some contained so much sand that they would break because it made them "rotten". He stated that using the machines on the parts would cause large amounts of dust to fly and the dust would create difficulty in his breathing. He testified that when he went home from work his clothes would look like he "had worked in a coal mine all day long. They was dusty and that stuff all over them. You could take them off and shake them like that there at their (indicating) and the dust would just roll." Previous to his employment with defendant, claimant had worked for seventeen years in coal mines.

A medical physician testified that claimant was "diagnosed, on the basis of his physical findings and x-ray, as having black lung disease, or so-called pulmonary silicosis, pulmonary emphysema, a history of possible pulmonary tuberculosis, and chronic

obstructive pulmonary disease" and was thereby "permanently disabled" from employment. He testified that claimant had some chronic lung disease previous to being employed by defendant but his employment there "was an aggravating factor in bringing about his present condition". He stated that emphysema "is a destructive disease of the lung" and silicosis an "obstructive disease" and that "the obstructive element of his disease was probably greater than the destructive element". Another medical physician testified that claimant had "pneumoconiosis, probably silicosis, and secondarily could be chronic restrictive and obstructive lung disease."

Defendant contends this evidence shows nothing more than that claimant was suffering from one of two conditions, one of which the defendant would not be liable for. We do not agree. The evidence of the two physicians established that while claimant had other lung diseases, silicosis was primarily responsible for his total disability.

Where silicosis was found to be a major contributing cause of the death of a former employee, in keeping with the liberal construction in favor of claimants, it was ruled that the widow was entitled to workmen's compensation benefits, notwithstanding that silicosis was not found to be the sole cause. *Johnson v. State Workmen's Compensation Commissioner,* 155 W.Va. 624, 186 S.E.2d 771 (1972). In *Fitterling v. Workmen's Compensation Appeal Board,* 21 Pa. Commw.Ct. 67, 343 A.2d 386, 388 (1975), the court noted that compensation is allowed when a claimant's total disability or death is caused by silicosis accompanied by active pulmonary tuberculosis, even though silicosis alone would not have been totally disabling. See also *Inland Steel Co. v. Mosby,* 375 S.W.2d 268 (Ky.1964) (silicosis and emphysema).

P.G.V. Babu, a medical physician whose qualifications were not questioned, stated in response to a hypothetical question [4] that

4. The question was:
"Doctor, I want to pose a hypothetical question to you now, that is a question where I ask you to assume as true certain facts and then ask you a question based on those. Please assume the following facts to be true?
1. That Melvin L. Barr is a white male who was born August 22, 1921.
2. That Mr. Barr was employed by Vicker's Inc., in Joplin, Missouri, from March or April of 1969 to May of 1975.
3. That throughout his employment at Vicker's, Mr. Barr worked as a machine operator, drilling holes into and milling parts off various metal housings and other metal parts.
4. That approximately 50% of the total number of metal housings and other metal parts upon which Mr. Barr did his drilling or millings were made of cast iron which had been produced by the 'sand casting' process.
5. That any piece of cast iron which is produced by the 'sand casting' method contains silica within the metal itself, and may also contain silica on the exterior surface of the metal.
6. That with respect to at least 5% of the sand cast iron parts on which Mr. Barr worked as aforesaid, his drilling or milling operation would have produced free-floating silica particles of small enough size to be inhaled into a person's lungs.
7. That in performing his drilling operations, Mr. Barr's head would be located with-

in 36 inches of the drilling point, above and to the front.
8. That in performing his milling operations, Mr. Barr's head would be located within 36 inches of the milling point, above and to the side.
9. That in performing his drilling or milling operations as aforesaid, Mr. Barr never wore a mask, respirator or other sort of protective breathing device, except for one period of approximately four or five days in 1975.
10. That some of the machines on which Mr. Barr worked had no ventilating system.
11. That some of the machines on which Mr. Barr worked had a ventilating system, but such ventilating system was often inoperative.
12. That Mr. Barr was engaged in his aforesaid drilling and milling operations for approximately six to seven hours per day, five days per week, and sometimes six or seven days per week, throughout his entire six-year period of employment at Vicker's.
13. That the area in which Mr. Barr worked was a large room perhaps 500 or 600 feet long and 100 or 150 feet wide, with a ceiling approximately 15 or 20 feet high. Windows were located on three sides of the room, and a vent was located in the ceiling. Fans were located on the ceiling.
14. That the aforesaid room contained numerous other drilling, cutting, milling and grinding machines, other than the ones on which Mr. Barr worked, which would be in operation while he was working.

**582**

"based upon reasonable medical certainty" it was "highly likely" that claimant was exposed to the hazard of silicosis. A few questions later he stated without qualification that based upon the facts in the hypothetical question that claimant was exposed to the hazard of silicosis.

■ The trial court has broad discretion in the matter of hypothetical questions to an expert witness. *Skelton v. General Candy Company,* 539 S.W.2d 605, 614 (Mo.App.1976). That maxim should also apply to the commission. While it is not essential that a hypothetical question include all material facts in evidence, it must fairly hypothesize the material facts reasonably relevant to, and justly present, the questioner's theory of the case so that an answer is of assistance to the trier of fact. *Odum v. Cejas,* 510 S.W.2d 218, 222 (Mo.App.1974); *Gavan v. H.D. Tousley Company,* 395 S.W.2d 266, 270 (Mo.App.1965). It appears to us that the question sufficiently set forth the relevant facts of claimant's theory.

■ Defendant also contends that the question assumes facts not in evidence. We are only concerned with deficiencies in the question to which a specific objection was made at the hearing. See *Skelton v. General Candy Co.,* 539 S.W.2d 605, 614 (Mo.App. 1976). Contentions were made there that paragraphs 5 and 6 were not supported by the evidence. Our review of the testimony of Carl Brandt and claimant convinces us that those matters are in evidence.

■ Brandt stated that the imbedding of sand in the metal is "true with any sand cast, cast iron casting" and it may exist on the surface. This supports paragraph 5. Paragraph 6 appears to be based on a combination of claimant's testimony that eight or ten out of every hundred pieces he worked on had sand pockets and Brandt's

testimony that 50% of pieces with sand pockets would produce silica when milling them and when that occurred there is a likelihood that micro-sized particles of silica sand can be placed in the air and inhaled.

Defendant questions Brandt's testimony because he stated that "it's possible" that drilling or milling by claimant would create free-floating silica. He later indicated that what he meant was that approximately half of the parts would have small enough particles of sand to become free-floating silica when drilled or milled. Defendant also contends that in all of Brandt's testimony he was only talking about possibilities. This is based on the following questions asked and answers given in cross-examination:

"Q. (By Mr. Martin) That's all you have been talking about here is possibilities and generalities?

A. With respect to inclusions of sand in a casting, yes, sir. With respect to some of the other things I said, I'm one hundred percent positive about some of them, particularly in my own industry.

Q. In your own industry?

A. Yes, sir.

Q. But you don't know anything about Vickers at all?

A. No, sir.

Q. When you are talking about silica exposure, you are merely talking about possibilities?

A. Yes, sir."

That he was talking of possibilities does not mean that he was saying that there was not a probability. His overall testimony indicates that he was "positive" about the essential parts of it and that he felt the matters he testified to were at least probable. Brandt's testimony, together with claimant's, was sufficient to support the

---

15. That the aforesaid vent in the roof was often closed while Mr. Barr was working.
16. That the aforesaid windows in the room where Mr. Barr was working were often closed.
Now, Doctor, assuming these facts to be true, do you have an opinion, based upon reasonable medical certainty, as to whether

Mr. Barr, in his employment at Vicker's, would have been employed in an occupation or process in which the hazard of the disease of silicosis existed?"
Paragraph 2 appears to be erroneous as the record indicates his employment began in June of 1969, but no question is raised about that discrepancy and it does not appear to be material.

facts presented to Dr. Babu in the hypothetical question.

Defendant also contends that even if the hypothetical question was proper, its answer was not because Dr. Babu "assumed" that sufficient free-floating silica was present to constitute a hazard. It appears to us that Dr. Babu determined, based on the facts hypothesized, that the claimant's work would create where he was breathing sufficient free-floating silica of the size which would enter the lungs and could cause silicosis. This is illustrated by the questions and answers set out below.[5]

■ Dr. Babu was from India and primarily educated in his profession there. Because English apparently is not his native tongue, that may have contributed to the questions being raised regarding his testimony. However, his testimony indicates that he was using assume to mean that he could infer from the facts hypothesized that there would be sufficient silica of the hazardous size in the air claimant was breathing. In legal as well as common parlance the terms "inference", "probability", "assumption", and "presumption" can have substantially the same meaning and import. *Ohio Building Safety Vault Co. v. Industrial Board,* 277 Ill. 96, 115 N.E. 149, 154 (1917).

■ We think the record established a basis for the commission to have found that Dr. Babu did not assume that there was sufficient free-floating silica to constitute a hazard where claimant worked, but felt that it could be determined or inferred from the facts stated in the hypothetical question that sufficient silica was in the air that

5. Q. But, to determine that, you have to know the amount of the concentration, don't you, Doctor?
A. Determine what?
Q. Whether or not silica is a hazard?
A. Silica is a hazard.
Q. You have to know whether or not it is a hazard in causing silicosis by knowing the concentration?
A. You are asking about the threshold of concentration?
Q. Yes, you have to know it. He didn't ask you about any amount of silica dust, did he?
A. No.
Q. So, you were assuming in answering this that it was above the threshold?
A. Yes.
Q. Were you not?
A. Yes.
Q. And, you were assuming something that was not included in his hypothetical question.
A. I was assuming that most fields in which he was working has got an amount of particles above the threshold, judging from what actually he was doing, how far away his face or nose is from the drilling operation and the material on which he is drilling, not from that question, that clause alone.
* * * * * *
Q. Now, Doctor, he has asked you to assume, and you have answered the question as yes, that a person working under the conditions he said that there is a hazard of the disease of silicosis?
A. Yes.
Q. Truthfully, before you could say that with any degree of medical certainty you would still have to know the amount of concentration and the period of time that a person inhales it, wouldn't you?
A. The period of time is already here.

Q. Okay, but you still have to know the amount of the concentration?
A. No.
Q. Or you at least have to know it's above the threshold?
A. No. I assume that.
Q. You assume it?
A. Because the inches from the work is laid down.
Q. Wait a minute. You said you assume that at Vicker's Plant here under his hypothetical it is above the hazard level?
A. I stick to the point that means he is doing a drilling procedure which is close to the mouth and nose and he is not wearing any mask, that's all what I need in order to ___.
Q. Well, Doctor, if that were true ___?
MR. ROBERTS [claimant's attorney]: Pardon me. Would you let the witness finish his answer?
MR. MARTIN: Yes.
A. That's all what I need in order to answer this question. That means he is exposed to hazards of silicosis or not with that history a person working with a drilling procedure of cast iron 36 inches from his mouth, not wearing a mask, well if you ask me a question is he exposed to the hazard, my answer would be yes and not no.
Q. And that would include a man doing the same thing out here in the open, not even in a closed room, I take it, is that right, he would still be exposed to it?
A. Yes.
Q. You and I walking by would be exposed to it?
A. No, we would be exposed not to the hazard, but what he is doing on a continuous basis, see.

claimant was breathing for him to be subjected to the hazard of silicosis.

His answer does not indicate a lack of probability because at one point he qualified his answer with "highly likely". In *Kinealy v. Southwestern Bell Telephone Company,* 368 S.W.2d 400, 404 (Mo.1963), the court said that an expert witness's statement as to causation that it was "extremely likely ... brings his testimony to the borderline of probability". However, construing his testimony as a whole, the court determined that the testimony there was that it was "possible", not "probable". The reverse is true here. A few questions later, at claimant's counsel's urging, Dr. Babu stated without reservation that, based on the facts hypothesized, claimant was exposed to the hazard of silicosis. His testimony as a whole established that he was of the opinion that it was at least probable that claimant was exposed to the hazard.

Of course, we are not concerned here with what the air contained in other areas of the plant, but whether there was sufficient hazardous free-floating silica where claimant was breathing. It was his proximity to the drilling or grinding that caused him to be in the necessary concentration although such a concentration may not have been contained in the air of the plant in general. Claimant's proof appeared to be as substantial as that required in other cases regarding employment where silicosis was claimed to be a hazard.[6] Based on claimant's testimony and that of Brandt and the medical physicians there was sufficient proof that claimant was totally and permanently disabled due to silicosis and that he was exposed to the hazard of silicosis for more than ninety days after August 13, 1974 by his employment with defendant. Having so determined we should reverse the judgment and give such judgment as should have been entered. Rule 84.14.

The judgment of the circuit court is reversed and the award of the Industrial Commission is reinstated and affirmed.

MAUS, P.J., and HOGAN, J., concur.

---

**6.** See *Smith v. Harbison-Walker Refractories Co.,* 340 Mo. 389, 100 S.W.2d 909 (1936); *King v. St. Louis Steel Casting Co.,* 353 Mo. 400, 182 S.W.2d 560 (1944); *Wommack v. Orr,* 352 Mo. 113, 176 S.W.2d 477 (1943); *Enyard v. Consolidated Underwriters,* 390 S.W.2d 417 (Mo.App. 1965); *Riggs v. A.P. Green Fire Brick Company,* 376 S.W.2d 635 (Mo.App.1964); *Leonard v. Fisher Body Co. St. Louis Division of General Motors Corp.,* 137 S.W.2d 604 (Mo.App.1940); *Wurst v. American Car & Foundry Co.,* 103 S.W.2d 6 (Mo.App.1937); *Crane Company v. Industrial Commission,* 32 Ill.2d 348, 205 N.E.2d 425 (1965); *Jones & Laughlin Steel Corporation v. Golmitz,* 28 Pa.Commw.Ct. 25, 367 A.2d 323 (1976); *Scobbo v. Workmen's Compensation Appeal Board,* 22 Pa.Commw.Ct. 109, 348 A.2d 169 (1975). Compare also, *Moore v. Carter Carburetor Div. ACF Industries,* 628 S.W.2d 936 (Mo.App.1982); *Fitzgerald v. Fisher Body St. Louis Co.,* 234 Mo.App. 269, 130 S.W.2d 975 (1939), opinion partially quashed *State ex rel. Fisher Body St. Louis Co. v. Shain,* 345 Mo. 962, 137 S.W.2d 546 (banc 1940).