**Burney S. CHOATE,**
**Claimant–Appellant,**

v.

**LILY TULIP, INC.,**
**Employer–Respondent.**

**No. 16996.**

Missouri Court of Appeals,
Southern District,
Division One.

March 27, 1991.

Rehearing Denied April 17, 1991.

Patrick J. Platter, Daniel, Clampett, Lilley, Dalton, Powell & Cunningham, Springfield, for claimant-appellant.

Raymond E. Whiteaker, Lee Ann Miller, Woolsey, Fisher, Whiteaker & McDonald, Springfield, for employer-respondent.

MAUS, Presiding Judge.

In this proceeding under The Workers' Compensation Law, the Administrative Law Judge awarded claimant, Burney S. Choate, permanent partial disability of 15 percent of his right elbow, 20 percent of his right shoulder, and 5 percent of the body as a whole based upon a cervical spine injury. He added a multiplicity of injury factor of 10 percent for 97.9 weeks. Upon claimant's appeal, the Labor & Industrial Relations Commission (Commission) affirmed the award of the Administrative Law Judge. The claimant appeals and asks that the cause be remanded to the Commission, with instructions, for reconsideration.

The employer, Lily Tulip, Inc., was engaged in the manufacture of paper and plastic products. It salvaged certain plastic materials by grinding. The ground material was placed in cardboard boxes 3 feet square. The boxes were stored in a room.

They were stacked in various numbers, as high as three or four. The ground material was used by selecting boxes by color of the material so that the salvaged material, when blended, would be a desired color.

On April 2, 1984, claimant was a blender operator. His duties included selecting the boxes of material as it was to be used in the salvage blender. In the course of doing so, he would often go to the top of the stacked boxes. There was evidence he descended from the top by "skidding" or stair-stepping down the side of the stacked boxes. On April 2, 1984, the claimant fell from the boxes or from a box.

The record presents two different accounts of claimant's fall. The claimant testified:

"Q  How high would that have made you?

A  That would have been close to—lacking few inches being three foot. It would be close to nine feet, if you're talking about my feet.

Q  Nine feet?

A  Yes.

Q  And then did you step on empty boxes or what did you do to make you fall?

A  Yes. I was walking—I was surprised that Charlie and the forklift driver leaving and leaving me up there with no way down. So, I begin to look to see if I could find a way to stairstep down, which sometimes I had done in the past; and as a result, when I stepped—when I stepped on these boxes, they were empty, and they collapsed with me. It was worse than falling. I was shot at a right angle, and I fell at a right angle."

He said that he fell a little before 1:00 p.m. He was unconscious until approximately 1:30 p.m. and when he came to, he was lying on the floor. He added, "I was completely paralyzed. I couldn't move nothing. The instinct says get up, and I couldn't. And the first thing I remember Danny—I didn't recognize him as Danny then—was sitting besides me and saying things, asking me things. And I—I was not around enough to know what he was saying or wasn't saying. I just remember saying 'I need air; I need air.'" He testified that Danny Medcalf helped him up and to a position in front of a fan. He was in a semi-conscious condition. Supervisor Charles Dixon arrived. Claimant was placed on Dixon's Cushman electric cart and taken to a nurse's station.

Danny Medcalf testified that he and another employee were riding a Cushman that was used to pick up spare parts. When he and the other employee drove back into the building where the boxes were kept, they heard someone "hollering for help". He and the other employee found the claimant on the floor with his head propped up against the boxes. He could not remember the name of the other employee that was with him. He continued, "The nurse got there, and the supervisor in charge had another Cushman, and they was, you know—the nurse checked him over. And anyway she had called an ambulance, and they set him on the back of this Cushman to take him out, you know, to where the ambulance was going to pull up to the Lily Tulip at."

On the other hand, retired co-employee Chester Ward testified that shortly before the fall, a little after 1:00 p.m., he was working with the claimant in the storage room. Ward left the room to go to the grinder and returned in about 10 minutes. When he returned, he found the claimant standing and coherent. Claimant said that he had fallen and hurt his arm. Danny Medcalf was not there. He said that there was an empty box next to the stacked boxes. Without objection, Ward testified, "Well, he didn't actually fall because he slid down off of there and into this box and then fell on the floor." Shortly after Ward found the claimant, supervisor Dixon arrived on a cart.

Dixon testified that he was riding a cart through the area. He saw the claimant and Ward. When he talked to the claimant, "[h]e told me he was climbing down off the boxes, and he stepped on an empty box and it gave way with him and he fell, he had hurt his elbow." He did not recall Danny Medcalf being there. The claimant

was taken on Dixon's cart to the nurse's station.

The claimant was then seen by DeArmond Moore, M.D. Dr. Moore caused various x-rays to be made and placed claimant's right arm in a sling. Claimant was referred to James Shaeffer, M.D., an orthopedist.

On April 3, 1984, claimant was examined and treated by Dr. Shaeffer. Dr. Shaeffer's diagnosis was "he had incurred a valgus stress to his elbow which pulled loose some ligaments with a little bone chip on the medial side of the elbow, and then had a compression fracture of the radius on the lateral side of the elbow." He periodically saw the claimant until January 7, 1985. He prescribed physical therapy for the claimant. During the course of treatment, claimant complained of headaches and pain in his elbow and shoulder. At claimant's request, Dr. Shaeffer x-rayed claimant's elbow and cervical spine on May 18, 1984. The elbow fracture was healing and there was nothing abnormal on the x-ray of the cervical spine. He unsuccessfully attempted to persuade claimant to return to work in July 1984. Dr. Shaeffer rated claimant's disability at 15% of the elbow and 20% of the shoulder. Dr. Shaeffer referred the claimant to his family physician, Dr. Cunningham, for an examination in reference to his headaches.

Dean Cunningham, M.D., had been claimant's family doctor since 1957. He had treated claimant for various conditions and accidents. He saw him in May 1979 with shoulder complaints resulting from a fall. The conditions for which he had treated the claimant included the following: Hypertension, Prostatitis, Obesity, Anxiety, and Probable Functional Gastrointestinal Disorder. The claimant had also repeatedly complained of dizziness. Dr. Cunningham did not treat the claimant for any injuries resulting from the 1984 fall and he did not rate the claimant. When Dr. Shaeffer referred claimant to Dr. Cunningham for his complaints of headaches, Dr. Cunningham caused a CT scan to be made of claimant's head "to make sure there was no subdural or anything that he might have as a result

of this fall." The CT scan was normal. In reference to claimant's complaints from the fall, Dr. Cunningham testified: "Well, if Mr. Choate is complaining now of headaches and dizziness, pain in his arm and shoulder, I don't know of any reason other than his fall in '84 that he might have it."

Charles Ash, M.D., an orthopedist, examined the claimant on December 10, 1984. He rated the claimant as having 5% disability of the shoulder. In his opinion, claimant was able to work.

On September 30, 1986, claimant was examined by William P. Folck, M.D., of Kansas City. Claimant gave Dr. Folck a history of having fallen 9 feet, unconsciousness of 30 minutes, and a skull fracture. Dr. Folck found the claimant difficult to evaluate because of claimant's opening comment that " '[t]his injury ruined me' " and because of an underlying problem which Dr. Folck diagnosed as Parkinson's disease. Claimant complained of "pain over his right side above the waist, including primarily the head, neck, right shoulder, right elbow and right hand." Based upon the history given by the claimant and his examination, Dr. Folck rated the claimant as follows: 65% of the shoulder and 25% of the body as a whole, due to possible skull fracture and concussion; or alternatively, a combined disability of 70% of the body as a whole. At his deposition, Dr. Folck disagreed with the subsequent finding of Dr. Quinn that the claimant did not have Parkinson's disease.

On January 9, 1987, claimant was examined by Rodney Quinn, M.D., a neurologist in Springfield. As stated, it was his opinion that the claimant did not suffer from Parkinson's. Claimant's complaints were headache, neck injury and right arm injury. Dr. Quinn found no objective abnormality. Based upon the examination and history given by the claimant, Dr. Quinn further found claimant was suffering pain in his right upper arm and post-concussion syndrome. On cross-examination, he said that the pain in the upper extremity was of unclear etiology. He agreed that the negative CT scan of November 1, 1984, indicated no injury to the brain or head.

Finally, claimant was examined on August 9, 1988, by Paul Arnold, M.D., an ophthalmologist. He found claimant's corrected vision of the right eye to be 20/40 for distance and near vision; and for his left eye, 20/60 for distance and 20/50 for near vision. He found the claimant had mild cataracts and macular degeneration. The cataracts were not related to trauma. Macular degeneration can result from trauma or age. In response to a hypothetical question, which included claimant's report he was unconscious and had a possible skull fracture, Dr. Arnold answered as follows: "The first condition, cataracts, are unrelated to the accident, but it, I do think it is reasonable to conclude that because of the nature of his fall that the foveal or macular degeneration which he has *could* be related to that type of a fall." (Emphasis added.) On cross-examination, he was asked the following question and gave the following answer: "[Q] But Doctor, again, if you were to assume as true that the information provided to you by the patient was incorrect in that he did not receive a skull fracture, and would that affect your opinion? [A] It would have to affect my opinion, sure."

The claimant states three points on appeal. The principles governing this court's review of the record are declared by § 287.495 and a host of cases. Principles relevant to this review have been summarized and concisely stated.

"All of the evidence and legitimate inferences therefrom must be viewed in the light most favorable to the award. This court may not substitute its judgment for that of the Commission. The award may be set aside only if there is no substantial and competent evidence to support it or if the findings of the Commission are clearly contrary to the overwhelming weight of the evidence. Conflicts in the evidence are for resolution by the Commission. *Blatter v. Mo. Dept. of Social Services,* 655 S.W.2d 819, 821[1–3] (Mo.App.1983). This court must disregard any evidence which might support a finding different from that of the Commission, and that is true although a finding of the Commission to the con-

trary would have been supported by the evidence. *Petersen v. Central Pattern Co.,* 562 S.W.2d 153, 155–156 (Mo.App. 1978). The Commission is charged with the responsibility of passing upon the credibility of all the witnesses and may disbelieve testimony of a witness even if no contradictory or impeaching evidence appears. Id.

'The claimant has the burden of proof to establish that she sustained an injury by accident arising out of and in the course of her employment, and that the accident resulted in the alleged injuries.' *Barnes v. Ford Motor Co.,* 708 S.W.2d 198, 199[1] (Mo.App.1986)." *Brown v. Hillhaven Convalescent Center,* 776 S.W.2d 47, 48–49 (Mo.App.1989).

■ The claimant's first point is:

"[The] Commission erred because the commission found that macular degeneration in the eyes of appellant was not due to the fall when, in fact, Dr. Paul Arnold, the only ophthalmologist to treat appellant's eyes testified that the macular degeneration was related to the fall."

The validity of this point is dependent upon the legal standard for evidence required to establish causation and a determination of whether or not the claimant's proof met that standard. The standard is well established.

"The burden was on the plaintiff to show the cause. Evidence that the condition *might or could have* been caused by either injury or disease without any substantial showing as to which of the possible causes did produce the condition, furnishes no basis from which a jury could determine the cause." *Adelsberger v. Sheehy,* 332 Mo. 954, 959, 59 S.W.2d 644, 646 (1933). (Emphasis added.)

Also see *Banner Iron Works v. Mordis,* 663 S.W.2d 770 (Mo.App.1983). Cases are collected in *Wiedmaier v. Robert A. McNeil Corp.,* 718 S.W.2d 174 (Mo.App. 1986).

■ However, the ultimate import of testimony of an expert concerning causation is to be drawn from all of the evidence. Under that analysis, a less than direct statement of reasonable medical certainty may be sufficient to establish causation. For

example, in *Bradshaw v. Brown Shoe Co.*, 660 S.W.2d 390 (Mo.App.1983), in response to a question which included the hypothesis that the plaintiff had no problem with her knee prior to the accident, the testimony of a physician that "he 'would have to assume that this was the cause of her chondromalacia' ", coupled with evidence of no prior history, established causation within a reasonable medical certainty. Cf. *Barr v. Vickers, Inc.*, 648 S.W.2d 577 (Mo.App. 1983).

However, that analysis, and such cases as *Bradshaw* and *Barr* cited by claimant, do not aid him. The relevant question, posed to Dr. Arnold, hypothesized the fact the claimant fell 9 feet and hit his head. The claimant gave Dr. Arnold a history of a skull fracture. Even upon the basis of that history and hypothesis, Dr. Arnold answered that "I do think it reasonable to conclude that because of the nature of his fall that the foveal or macular degeneration which he has *could* be related to that type of a fall." (Emphasis added.) When asked if knowledge that the claimant did not suffer a skull fracture would affect his opinion, his succinct answer was "it would have to affect my opinion, sure." The obvious conclusion is that Dr. Arnold relied upon a false premise in reaching the conclusion that the fall *could* have caused the macular degeneration.

Dr. Arnold subsequently testified that the type of macular degeneration he observed did not appear to be age related. However, he did not subsequently testify in any fashion that the fall, within reasonable medical certainty, caused the macular degeneration. The claimant did not initially complain of hitting his head. The x-ray taken the following day was negative for a skull fracture. The 1984 CT brain scan was negative. There was evidence he was not unconscious. Evidence that the condition could have resulted from aging or injury is not proof of causation. *Wiedmaier*, supra. There is nothing in Dr. Arnold's testimony to support a finding that within reasonable medical certainty the fall did cause the macular degeneration.

Moreover, "[b]earing in mind that the question for us to determine under DVC's first point is whether the Commission's finding that claimant's injury arose out of and in the course of his employment by DVC is supported by competent and substantial evidence, and not whether a decision adverse to claimant on that issue would have had sufficient evidentiary support, *Karch v. Empire District Electric Co.*, 358 Mo. 1062, 218 S.W.2d 765, 770 (1949); *Davis v. McKinney*, 303 S.W.2d 189, 193 (Mo.App.1957), we hold, on the authority of *Nichols*, that the evidence is sufficient to sustain the finding of the Commission." *Tyra v. Delta Veterinary Clinic, Inc.*, 687 S.W.2d 931, 935 (Mo.App. 1985). *Wiedmaier*, supra. The claimant's first point is denied.

■ The claimant's second point is: "The ... commission erred ... because the award was not based upon ... competent evidence and instead based upon incompetent evidence because the commission gave great weight to the discrepancy as to whether appellant fell three feet or nine feet, [and] not one physician ever testified that the discrepancy ... would have any significance...." This point singles out one of the following two findings:

"Two factors weighed heavy in my consideration in arriving at a final award. The first one being employee's tendency (in my opinion) to overstate and/or exaggerate his complaints. The second factor was the discrepancy in the distance that the employee fell. The initial examination (one day after the incident in question) indicates that the employee fell a distance of 3 feet. The balance of the examinations indicate a fall between 9 and 12 feet."

The obvious import of these findings is that the Commission found the claimant less than credible. Claimant testified and, except for his report to Dr. Shaeffer, told physicians he fell 9 feet and hit his head and had a skull fracture. When he personally filled out a report the day after the fall, claimant wrote: "At work. Fell off a 3 ft Box." Supervisor Dixon testified that immediately after the fall, the claimant said that he fell off a box and hurt his elbow.

There was medical evidence that if the motion of claimant's shoulder was restrict-

ed as he testified, there would have been atrophy in his arm, and yet no atrophy existed. Dr. Folck testified, "I could not make an adequate determination of strength tests. He would not make an effort to exert strength against resistance." Another physician testified there were no objective findings to form the basis of claimant's complaints.

The Commission's finding of a lack of credibility is reflected in its express determination that the claimant fell 3 feet. The Commission is the judge of the credibility of witnesses. *Wiedmaier*, supra. The evidence supports the findings of the Commission quoted above. Claimant's second point is denied.

The claimant's third point is that the Commission erred in excluding certified copies of physical therapy treatment records of a registered physical therapist because they were admissible under § 287.140.6 and as business records under § 490.692. The seven pages, tendered as one exhibit, includes three pages headed "Evaluation". Those three pages in no way purport to be a record of treatments, but contain a summary of findings and conclusions. The exhibit also includes a letter dated January 10, 1985, to the claimant's attorney.

This exhibit is not a record of "medical aid" and was not admissible under § 287.140.6. Cf. *Sprung v. Interior Const. Service,* 752 S.W.2d 354 (Mo.App. 1988); *State v. Thrasher,* 654 S.W.2d 142 (1983). Nor is the exhibit a record of an act, condition or event made in the regular course of business, at or near the time of the act, condition or event within the meaning of § 490.680, which is incorporated into § 490.692. *Allen v. St. Luke's Hosp. of Kansas City,* 532 S.W.2d 505 (Mo.App. 1975). Claimant's third point is denied and the award of the Commission is affirmed.

CROW and PARRISH, JJ., concur.
PREWITT, J., recused.